# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ELLIOT LAWRENCE JONES II,**<br><br>Petitioner,<br><br>v.<br><br>**JIM ROBERTSON**,<br><br>Respondent. | Case No. 1:20-cv-01357-DAD-EPG (HC)<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner Elliot Lawrence Jones II is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In the petition, Petitioner's sole claim for relief is that the state court had insufficient evidence to sustain convictions on six counts of kidnapping for robbery.

For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

## I.

## BACKGROUND

On September 18, 2017, Petitioner was convicted by a jury in the Kern County Superior Court of six counts of kidnapping for robbery (counts 4–9); first degree burglary (count 10); nine counts of false imprisonment (counts 11–19); seven counts of robbery (counts 20–26); and unlawful possession of a firearm (count 27). (2 CT[1] 567–70). Petitioner was then sentenced to

---
[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on November 19, 2020. (ECF No. 13).

1

six indeterminate terms of life with a minimum parole eligibility date of fourteen years, plus a determinate term of 129 years, four months. (3 CT 662). On August 14, 2019, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Jones, No. F076570, 2019 WL 3812363, at *12 (Cal. Ct. App. Aug. 14, 2019), review denied (Nov. 13, 2019), vacated, 2020 WL 814017 (Cal. Ct. App. Feb. 19, 2020).[2] Petitioner filed a petition for review in the California Supreme Court and the California Supreme Court summarily denied the petition on November 13, 2019. (LD[3] 23, 24).

On September 23, 2020, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). Respondent has filed an answer to the petition, and Petitioner has filed a traverse. (ECF Nos. 12, 16).

## II.

## STATEMENT OF FACTS[4]

As of December 5, 2015, Tony C. resided in an apartment on East Commercial Drive, in Ridgecrest.[5] "Sam" stayed at the apartment sometimes.

Sometime after 6:00 p.m., Alexander B. went to the apartment to socialize. Tony, "T.J.," Leopoldo S., and someone Alexander knew as Casey were already at the apartment when Alexander arrived. Eventually, Tony and Casey left.

Alexander heard knocking on the front door and went to see who it was. Two African-American men, one tall and one shorter, were there. They asked for Tony. Alexander said he was not there right then but should be back soon. He invited the men inside to wait, then headed for the back bedroom, where he was playing video games. The two men walked behind him until they reached the bedroom, where there was a safe next to the door. The men seemed to be angry with Tony. They told those in the bedroom to sit down and pull out their wallets and phones, and they said they were going to take the safe. Each had a handgun. They were trying to figure out the combination to the safe. When Alexander said he did not know it, they started grabbing items and tried to carry the safe out of the apartment. They told Alexander, T.J., and Leopoldo to go in the closet and wait until they got done.

The two men asked Alexander if there was a bag or something they could use. He went into another room and got a backpack. When he returned, the pair told the others to get out of the closet. Shortly after, Alexander heard a knock at the door.

---

[2] The Appellate Court subsequently struck down certain enhancements regarding Petitioner's sentencing pursuant to changes in state law but otherwise affirmed the judgment.
[3] "LD" refers to the documents lodged by Respondent on November 19, 2020. (ECF No. 13).
[4] The Court relies on the California Court of Appeal's February 19, 2020, opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
[5] Undesignated dates in the statement of facts are from the year 2015. Pursuant to California Rules of Court, rule 8.90, we refer to certain persons by their first names and/or initials. No disrespect is intended.

2

One or both suspects walked behind him to the front door while holding a gun on him. When Alexander opened the front door, three or four people he did not know were standing outside. The suspect told everyone to get inside. According to Alexander, the suspect told them to get on the ground and hand over their wallets and cell phones, then everyone was moved into the back bedroom. At some point, Alexander, Leopoldo, T.J., and the newcomers all were in the closet.

At approximately 8:00 that evening, Jacob C., Nolan C., Ryan M., Seth M., Savion T., and Aries P. went to the apartment. Seth and Ryan stopped to smoke a cigarette near the patio, while the others went to the front porch. Nolan knocked, and the door was opened after about five seconds. There were two men standing in the doorway. Both were African-American; one — defendant — was tall, while the other one was shorter and wore glasses. Nolan's group asked if Sam was there. The men said yes and welcomed the group inside.

Once the group came inside, the shorter man closed the door. He and defendant both put on ski masks with holes cut out for the eyes and mouth. Defendant had a silver and rusted metallic semiautomatic handgun, while the shorter man had a smaller black handgun.[6]

Defendant and his companion immediately started shoving the group away from the entranceway. They pointed their guns at the group of friends and pushed them further into the apartment. They moved the group out of the living room, into a short hallway, and into a very small closet.[7] An Asian male and a Hispanic male, with whom Jacob was not acquainted at the time, were already in the closet. That meant six people were in the closet at that point. It was "[e]xtremely" cramped.

Defendant and his companion told the group not to move and asked where the safe was. When Savion and Nolan asked what safe, defendant and the shorter man said, "You know what we're talking about, the safe, Sam's safe." Defendant and his companion then commanded each man in turn to take everything out of his pockets.[8] While this was happening, one man pointed his gun at the person emptying his pockets, while the other was waving his gun at the rest of those in the closet. Those in the closet handed over wallets and/or cell phones.[9] One of the

---

[6] According to Aries, Jacob and Ryan were the ones smoking, while Aries, Nolan, and Savion were "greeted with guns pointed at [their] face[s]." Both suspects had their ski masks on as soon as Aries and his companions walked in. They wore the masks the entire time.

[7] Jacob estimated the hallway was about six feet long, while it was about 15 feet from the apartment entrance to the closet.

[8] According to Aries, the two men told the group to empty out their pockets, then they said to get in the back closet.

[9] It was at this point that the taller man removed his ski mask, and Jacob was able to see his face. On December 7, Jacob selected defendant's picture from a photographic lineup. At trial, Jacob identified defendant as the taller man. Aries kept his head down and so never saw the taller suspect's face. He testified at trial that he could not have identified the perpetrators at any time. According to Detective Cushman of the Ridgecrest Police Department, however, the department issued a press release on December 10 that consisted of photographs of defendant and the other suspect and a brief summary of what had occurred. When Cushman met with Aries on December 23, Aries said he had seen the press release, and the suspects in the photographs were the perpetrators. Ryan saw both suspects with and without their ski masks, but could not recall what their faces looked like at trial. Alexander identified defendant from a photographic lineup shown to him on December 7. Several months later, however, Alexander wrote a letter to the district attorney's office in which he stated his belief that any statement he provided should be discredited due to his inebriation at the time of the robbery and his poor vision. At trial, he testified that had he not previously looked at photographs, he would not have been able to pick out anyone in the courtroom.

According to Aries, the two men told the group to empty out their pockets, then they said to get in the back closet. About three minutes later, Jacob and Ryan were thrown into the closet.

3

men said to tell Sam that two men had come and that Sam had to pay them. They said Sam owed them $2,000.

Meanwhile, Ryan and Seth were outside, smoking. At some point, a tall African-American man came up to them and told them to put out the cigarettes and follow him inside. Once inside, Ryan saw the shorter African-American man waiting at the opposite end of the living room. That shorter man was holding a small black handgun. The taller man then put a black and tan handgun to Ryan's back. The men told Ryan and Seth to drop whatever they had on them.

At some point, defendant ordered Ryan into the closet at gunpoint. The shorter man struck Seth in the face and shoved him into the closet. Defendant and the shorter man then ordered Ryan and Seth to stand up, one at a time, and empty out their pockets. They then closed the closet doors. There were now eight people in the closet.

Jacob heard defendant and the other man walk toward the living room. A Hispanic male eventually opened the closet door and asked why they were in the closet. Defendant and his companion were gone. Jacob estimated that he was in the closet for 10 minutes, and that five minutes elapsed from the time defendant and the shorter man shut the closet doors on the eight individuals to when the Hispanic male opened the closet door. Ryan, Jacob, Nolan, and Seth then drove to the police station to report what had happened.

On December 7, Cushman was at the apartment on East Commercial when Samuel C. arrived. Samuel showed Cushman incoming text messages on his cell phone. The messages read, "Call back, pussy. You gotta pay up"; "I'm watching your pad. Call me so we can talk"; "You talking to police"; and "Sammie?"

On the morning of December 10, defendant was apprehended in Las Vegas, Nevada. He was the sole occupant of a black Lexus ES sedan.[10] A backpack in the trunk contained paperwork bearing defendant's name; a loaded, .40-caliber, black and steel semiautomatic handgun; and two cell phones. The number of one of those cell phones matched the number associated with the text messages Samuel showed Cushman on December 7.

Jones, 2020 WL 814017 at * 2-4 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed

---

[10] On February 4, Cushman was present during a traffic stop in which defendant was the sole occupant of the same vehicle. At trial, Cushman was able to recognize defendant from security video obtained from a camera outside the apartment where the robbery occurred. The video also showed a vehicle consistent with the Lexus in the area of the apartment. Other video showed Henry F. ("the shorter one") walking to the vehicle, followed by defendant. The vehicle trunk was opened, and defendant attempted to place a safe in the trunk. He ended up going around to the rear passenger door and putting it in the car. Henry appeared to be carrying a backpack. The vehicle then drove away.

4

by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

1    If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

AEDPA requires considerable deference to the state courts. Generally, federal courts "look through" unexplained decisions and review "the last related state-court decision that does provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). This presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

"When a federal claim has been presented to a state court[,] the state court has denied relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that

the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits and there is no reasoned lower-court opinion, a federal court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not *de novo* review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

## IV.
## REVIEW OF PETITIONER'S CLAIM

**Sufficiency of the Evidence**

In his sole claim for relief, Petitioner asserts that there was insufficient evidence to sustain his six convictions of kidnapping for robbery because the movement of the victims was incidental to the robbery, and the movement did not increase the risk of harm to the victims. (ECF No. 1 at 16).[11] Respondent argues that the State Court reasonably rejected Petitioner's insufficiency claim. (ECF No. 12 at 14). This claim was raised on direct appeal in the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. This claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LD 24). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's sufficiency of the evidence claim, the California Court of Appeal stated:

---

[11] Page numbers refer to the ECF page numbers stamped at the top of the page.

7

## **Sufficiency of the Evidence**

Defendant challenges the sufficiency of the evidence to sustain his convictions on counts 4 through 9, kidnapping to commit robbery. He claims the movements of the victims were merely incidental to the robberies and did not increase the risk of harm over and above that necessarily present in the underlying crimes. We disagree.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578, 162 Cal.Rptr. 431, 606 P.2d 738; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson, supra*, at p. 578, 162 Cal.Rptr. 431, 606 P.2d 738.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425, 90 Cal.Rptr. 417, 475 P.2d 649.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548, 111 Cal.Rptr. 183, 516 P.2d 887), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367, 157 Cal.Rptr. 769). "If the circumstances reasonably justify the [trier of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755, 79 Cal.Rptr. 529, 457 P.2d 321.) Instead, reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331, 75 Cal.Rptr.2d 412, 956 P.2d 374.)

Section 209, subdivision (b) proscribes aggravated kidnapping, i.e., kidnapping to commit robbery or an enumerated sex offense. Under this section, "the victim must be forced to move a substantial distance, the movement cannot be merely incidental to the target crime, and the movement must ... increase the risk of harm to the victim. Application of these factors in any given case will necessarily depend on the particular facts and context of the case." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1153, 47 Cal.Rptr.3d 575, 140 P.3d 866, italics omitted (*Dominguez*); see, e.g., *People v. Martinez* (1999) 20 Cal.4th 225, 232-233, 236-237, 83 Cal.Rptr.2d 533, 973 P.2d 512, overruled on another ground in *People v. Fontenot* (2019) 8 Cal.5th 57, 70, 251 Cal.Rptr.3d 341, 447 P.3d 252; *People v. Rayford* (1994) 9 Cal.4th 1, 12-14, 36 Cal.Rptr.2d 317, 884 P.2d 1369; *People v. Daniels* (1969) 71 Cal.2d 1119, 1134, 1139, 80 Cal.Rptr. 897, 459 P.2d 225 (*Daniels*).)[12]

---

[12] *Dominguez* states the test as requiring a *substantial* increase in the risk of harm to the victim. (*Dominguez, supra*, 39 Cal.4th at p. 1153, 47 Cal.Rptr.3d 575, 140 P.3d 866.) That is the so-called *Daniels* test. In *Daniels, supra*, 71 Cal.2d at page 1139, 80 Cal.Rptr. 897, 459 P.2d 225, the California Supreme Court held that section 209 "exclude[d] from its reach not only 'standstill' robberies [citation] but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself. [Citation.]" *Daniels* relied in part on the definition of kidnapping contained in former section 207, to wit, a carrying of a person " 'into another country, state, or county, or into another part of the same county ....' " (*Daniels, supra*, at pp. 1126, 1131, 80 Cal.Rptr. 897, 459 P.2d 225.)

The *Daniels* test was applicable to the statute construed in *Dominguez*. (*Dominguez, supra*, 39 Cal.4th at pp. 1149-1150 & fn. 5, 47 Cal.Rptr.3d 575, 140 P.3d 866.) After the offense at issue in *Dominguez* was committed, however, section 209 was revised to read in pertinent part, as it does today: "(b)(1) Any person who kidnaps or

The two elements — nonincidental movement of the victim and increase in the risk of harm to the victim — "are not mutually exclusive but are interrelated. [Citations.]" (*People v. Vines* (2011) 51 Cal.4th 830, 870, 124 Cal.Rptr.3d 830, 251 P.3d 943, overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104, 233 Cal.Rptr.3d 378, 418 P.3d 309.)

> "With regard to the first prong, the jury considers the 'scope and nature' of the movement, which includes the actual distance a victim is moved. [Citations.] There is, however, no minimum distance a defendant must move a victim to satisfy the first prong. [Citations.]
>
> " ' "The second prong of the *Daniels* test refers to whether the movement subjects the victim to a[n] ... increase in risk of harm above and beyond that inherent in [the underlying crime].[13] [Citations.] This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." ' [Citation.]" (*People v. Vines, supra*, 51 Cal.4th at p. 870, 124 Cal.Rptr.3d 830, 251 P.3d 943.)

"There is no merit to the contention that whether a kidnap[p]ing occurred depends on the *distance* covered by the asportation. The test is whether the asportation was *substantial* which in turn depends upon the circumstances of the case. [Citation.]" (*People v. Ellis* (1971) 15 Cal.App.3d 66, 73, 92 Cal.Rptr. 907.) "Measured distance ... is a relevant factor, but one that must be considered in context, including the nature of the crime and its environment. In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient." (*Dominguez, supra*, 39 Cal.4th at p. 1152, 47 Cal.Rptr.3d 575, 140 P.3d 866.) "Where movement changes the victim's environment, it does not have to be great in distance to be substantial. [Citation.]" (*People v. Shadden* (2001) 93 Cal.App.4th 164, 169, 112 Cal.Rptr.2d 826 (*Shadden*).)[14]

In the present case, although the distance the victims were forcibly moved was not lengthy, they were not merely moved around inside the premises. The movement was substantial.

"Brief movements to facilitate ... robbery ... are incidental thereto within the meaning of *Daniels*. [Citations.] On the other hand movements to facilitate the

---

carries away any individual to commit robbery, [or an enumerated sex offense], shall be punished by imprisonment in the state prison for life with possibility of parole. [¶] (2) This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (Stats. 1997, ch. 817, §§ 1-2.) Thus, although *Daniels* continues to state the basic requirements for a violation of section 209, subdivision (b)(2) of that statute no longer requires that the movement " 'substantially' " increase the risk of harm to the victim, contrary to much of the decisional authority of the California Supreme Court. (*People v. Martinez, supra*, 20 Cal.4th at p. 232, fn. 4, 83 Cal.Rptr.2d 533, 973 P.2d 512.)

[13] The risk may be of physical or psychological harm. (*People v. Nguyen* (2000) 22 Cal.4th 872, 886, 95 Cal.Rptr.2d 178, 997 P.2d 493.)

[14] We recognize *Shadden* involved a kidnapping to commit rape (*Shadden, supra*, 93 Cal.App.4th at p. 167, 112 Cal.Rptr.2d 826), and that "[k]idnapping for the purpose of robbery is not analogous to kidnapping for the purpose of rape" (*People v. Robertson* (2012) 208 Cal.App.4th 965, 986, 146 Cal.Rptr.3d 66). This does not mean, however, that kidnapping to commit robbery necessarily requires lengthier asportation before a conviction under section 209 can be upheld.

| | |
|---|---|
| 1 | foregoing crime ... that are for a substantial distance rather than brief are not incidental thereto within the meaning of *Daniels*. [Citations.]" (*In re Earley* (1975) 14 Cal.3d 122, 129-130, 120 Cal.Rptr. 881, 534 P.2d 721.) We have concluded the movement of the victims in the present case was substantial. Moreover, while moving the victims and shutting them in the closet may have made it easier for defendant and his coperpetrator to steal the safe and other items from the apartment, the movement of the victims was neither necessary to nor facilitated the robbery of the victims themselves. Those who had their wallets and cell phones taken just before being made to enter the closet could have had those belongings taken upon entry into the apartment. Where those belongings were taken before the particular victim was moved to the closet, the movement was unnecessary. " '[A] movement unnecessary to a robbery is not incidental to it at all.' [Citations.]" (*People v. Leavel* (2012) 203 Cal.App.4th 823, 835, 137 Cal.Rptr.3d 817; cf. *People v. Washington* (2005) 127 Cal.App.4th 290, 299-300, 25 Cal.Rptr.3d 459.) |

"The 'risk of harm' test is satisfied when the victim is forced to travel a substantial distance under the threat of imminent injury by a deadly weapon. [Citation.]" (*In re Earley, supra*, 14 Cal.3d at p. 131, 120 Cal.Rptr. 881, 534 P.2d 721, fn. omitted, superseded by statute on another point as stated in *People v. Vines, supra*, 51 Cal.4th at p. 869 & fn. 20, 124 Cal.Rptr.3d 830, 251 P.3d 943.) Here, the victims were moved at gunpoint. According to Jacob, Aries was shaking and would not respond when Savion nudged him and asked if he was okay. Ryan described conditions inside the closet as "cramped" and "elbow to elbow." Thus, there was evidence of increased risk of both physical and psychological harm.

The victims in the present case were in grave danger during and after the asportation. There can be little doubt that had defendant and/or his cohort started shooting, the victims would not have escaped unscathed. Under the circumstances, a rational juror could have concluded the movement was substantial and increased the risk of harm to the victims. That the perpetrators did not fire their weapons and the victims only spent minutes in the closet does not change this.

We have undertaken "a 'multifaceted, qualitative evaluation' of the evidence," in which we have considered the totality of the circumstances viewed in the light most favorable to the People. (*People v. Corcoran* (2006) 143 Cal.App.4th 272, 279, 280, 48 Cal.Rptr.3d 851.) We conclude substantial evidence supports the kidnapping for robbery convictions (counts 4-9).

Jones, 2020 WL 814017 at *4–7 (footnotes in original).

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State

law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 556 U.S. 1, 2 (2011). Moreover, when AEDPA applies, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id.

Under California law, kidnapping to commit robbery requires movement of the victim "beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." California Penal Code § 209(b). This requirement is viewed as an interrelated two-prong test where prong one considers the scope and nature of the movement, and prong two considers factors that may increase the risk of harm to the victim. People v. Vines, 51 Cal. 4th 830, 870, 124 Cal. Rptr. 3d 830, 251 P.3d 943 (2011), overruled on another ground by People v. Hardy 5 Cal. 5th 56, 104, 233 Cal. Rptr. 3d 378, 418 P.3d 309 (2018). Deciding whether the movement goes beyond that merely incidental to the commission of the underlying offense requires a fact specific analysis that hinges on the circumstances of the movement and does not rely solely on the distance a victim is moved. Vines, 51 Cal. 4th at 870. Deciding whether the movement increases the risk of harm to the victim includes considerations of factors such as: "the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." Id.

First, the California Court of Appeal addressed the element of nonincidental movement and noted that "although the distance the victims were forcibly moved was not lengthy, they

were not merely moved around inside the premises." Jones, 2020 WL 814017, at *6. Instead, the circumstances indicate that the victims were forcibly moved at gunpoint into a crowded closet, and that "the movement of the victims was neither necessary to nor facilitated the robbery of the victims themselves." Id. Notably, some of the victims had their wallets and cell phones taken just before being made to enter the closet, while the others had their belongings taken upon entry into the apartment and were subsequently moved to the closet. Id. Petitioner does not dispute the facts regarding the movement of the victims, but instead challenges their legal significance. (ECF No. 1 at 16) ("[T]he movement of the alleged victims was merely incidental… and did not increase the risk of harm to the victims…").

Viewing the record in light most favorable to the prosecution, a rational trier of fact could have found true beyond a reasonable doubt that the scope and nature of the victims' movement by Petitioner was beyond that merely incidental to the commission of the underlying offense. As noted by the California Court of Appeal, while the actual distance the victims were forcibly moved was not lengthy, and moving the victims to the closet may have made it easier to steal items in the apartment, such movement was nevertheless unnecessary to the underlying robberies. Jones, 2020 WL 814017, at *6. The jury reasonably could have interpreted the movement of the victims that had already been robbed as unnecessary because the robberies were already completed. Additionally, the movement of those robbed after having been moved to the closet was unnecessary because the movement did not facilitate the robberies. As the jury could reasonably conclude that the victims' movement was unnecessary, it could then reasonably interpret the unnecessary movement as not incidental to the robbery. See People v. Leavel, 203 Cal. App. 4th 823, 835, 137 Cal. Rptr. 3d 817, 828 (2012) ("[A] movement unnecessary to a robbery is not incidental to it at all.") (alternation in original).

Second, the California Court of Appeal addressed the "risk of harm" element and noted that the victims were forcibly moved a substantial distance at gunpoint into a cramped closet. Jones, 2020 WL 814017, at *6. That the victims were moved at gunpoint into the closet is, again, not challenged by Petitioner. (ECF No. 1).

Viewing the record in the light most favorable to the prosecution, a rational trier of fact could have found true beyond a reasonable doubt that Petitioner increased the risk of harm to the victims beyond that inherent in the underlying offense. As noted by the California Court of Appeal, the victims were "in grave danger during and after the asportation" due to the movement at gunpoint followed by the cramped, elbow-to-elbow conditions found within the closet. Jones, 2020 WL 814017, at *6. Both of these conditions act to increase the potential risk of physical and psychological harm to the victims. For instance, the jury reasonably could have interpreted the victims' forced movement at gunpoint as creating the risk to the victims of being shot, whether or not the weapon was ultimately discharged. Moreover, being in a cramped closet increases the chance that the victims would accidentally harm each other or suffer psychologically from the confined space. Therefore, the jury reasonably could have concluded that when Petitioner moved the victims at gunpoint into a crowded closet, the movement increased the risk of harm to the victims beyond that of the underlying offense.

Moreover, "'[a]fter AEDPA, we apply the standards of Jackson with an additional layer of deference' to state court findings." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011) (alteration in original) (quoting Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005)). Under this doubly deferential standard of review, the state court's denial of Petitioner's sufficiency of evidence claim with respect to the movement of and danger to the victims was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief, and the petition should be denied.

## IV.

## RECOMMENDATION

Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District

Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **May 5, 2021**

/s/ Erica P. Grosjean
UNITED STATES MAGISTRATE JUDGE